# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DO NO HARM,<br><br>*Plaintiff*,<br><br>   v.<br><br>THE UNIVERSITY OF PENNSYLVANIA HEALTH SYSTEM; PERELMAN SCHOOL OF MEDICINE AT THE UNIVERSITY OF PENNSYLVANIA; THE UNIVERSITY OF PENNSYLVANIA; TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA; THE CONSORTIUM OF DEI HEALTH EDUCATORS; and WURD RADIO, LLC,<br><br>*Defendants.* | Civil Action No.: |

## COMPLAINT

Do No Harm brings this action against the University of Pennsylvania Health System, Perelman School of Medicine at the University of Pennsylvania, the University of Pennsylvania, the Trustees of the University of Pennsylvania, the Consortium of DEI Health Educators, and WURD Radio, LLC, under Title VI of the Civil Rights Act of 1964, Section 1557 of the Affordable Care Act, and Pennsylvania law. Do No Harm seeks declaratory relief, injunctive relief, and nominal damages.

1.    "[R]acial discrimination is invidious in all contexts," especially in healthcare *SFFA v. Harvard*, 600 U.S. 181, 214 (2023) (cleaned up). It "demeans the dignity and worth" of providers and patients to judge them "by ancestry" instead of

their "merit and essential qualities." *Id.* at 220. And when American citizens are put on "racial registers," it "demeans us all." *Id.* at 262 (Thomas, J., concurring).

2.    Despite these hard-won principles, the medical profession has been besieged by the pernicious ideology of "racial concordance." Racial concordance states that patients do better when they are the same race as their doctors and that they do worse when they are a different race from their doctors. This bunk ideology encourages patients and doctors to treat each other not as individuals but as components of racial groups. It sows distrust between patients and doctors who are different races. And it prioritizes race over medical skill, judgment, and experience.

3.    But racial concordance has been thoroughly debunked. *See* Kingsbury & Greene, *Racial Concordance in Medicine: The Return of Segregation* 3, Do No Harm (Dec. 19, 2023), perma.cc/339T-Y23Z. Do No Harm conducted an exhaustive study of the research supposedly supporting racial concordance. "Medical research does not support racial concordance." *Id.* This "return of segregation of medicine" is "a recipe for even worse health outcomes for members of every race." *Id.*

4.    Defendants embrace racial concordance—to the extreme. Defendants say there are "[r]acial health disparities" in Philadelphia. Ex. A, *About Us*, Black Doctors Directory (last visited Mar. 17, 2025), perma.cc/U3AF-P5DM. Then they blame these disparities on so-called systemic racism—in other words, a failure of non-black doctors: "When [black patients] enter the health systems, our humanity is not seen. It's not valued. It's not respected." onWURD, *Black Doctors Directory* 2:21-2:29, YouTube (Oct. 8,

2024), bit.ly/4iHaqQI. Defendants believe that "racial congruence" would "improv[e] outcomes for African American patients." Ex. A.

5.     From that flawed premise, Defendants created the Black Doctors Directory. The Directory collects and shares information about doctors in southeastern Pennsylvania, New Jersey, and Delaware with the goal of making it easier for black patients to find black doctors. Non-black doctors are excluded. No matter how regularly they treat black patients. No matter how sincerely they care for all patients. And no matter how much they improve their patients' health.

6.     The Black Doctors Directory is illegal. Congress enacted Title VI of the Civil Rights Act of 1964 to root out racial discrimination by entities that accept federal financial assistance. "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

7.     The Directory is a federal program or activity under Title VI because it is an operation of Penn Medicine and the Consortium. Penn Medicine receives federal financial assistance; all of their operations—including the Directory—are covered by Title VI. All of the Consortium's operations are covered because the Consortium is an entity created by Philadelphia-area medical schools that are federal-funds recipients. And WURD Radio is liable under Title VI because it exercises "controlling authority" over the Directory, a federal program or activity. *See, e.g.*, *Smith v. NCAA*, 266 F.3d 152,

160 (3d Cir. 2001); *Doe One v. CVS Pharmacy, Inc.*, 2022 WL 3139516, at *12 (N.D. Cal.

Aug. 5). Defendants' exclusion of non-black doctors from the Directory because of

race violates Title VI.

8.      The Directory also violates Section 1557 of the Affordable Care Act. Con-

gress enacted Section 1557 to root out racial discrimination from "health program or

activity." 42 U.S.C. §18116(a). The Directory constitutes a health program or activity

because it assists patients in obtaining health-related services. 45 C.F.R. §92.4. Defend-

ants are liable under Section 1557 for excluding non-black doctors from this health

program or activity. In addition, the Directory is a health program or activity because it

is an operation of Penn Medicine and the Consortium, which are principally engaged in

providing medical care and health education for healthcare professionals. At a mini-

mum, because Defendants violate Title VI, they also violate Section 1557.

9.      Defendants are also liable for civil conspiracy under Pennsylvania com-

mon law because they conspired to intentionally exclude non-black doctors from the

Directory in violation of Title VI and Section 1557. And Defendants' conspiracy

harmed non-black doctors, including Do No Harm's members.

10.     To the extent *individual* black patients have been "wronged by unlawful

racial discrimination," those individual patients "should be made whole." *Adarand Con-*

*structors, Inc. v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part and concur-

ring in the judgment). But the law prohibits race-based programs, like the Directory,

that are untethered to remedying individual instances of discrimination but instead try

4

to fix vague "past societal discrimination." *Harvard*, 600 U.S. at 226. Such race-based programs violate both the "letter" and "spirit" of equality woven into Title VI and Section 1557. *Harvard*, 600 U.S. at 227.

11.     "Eliminating racial discrimination means eliminating all of it." *Id.* at 206. It's especially essential to eliminate the "mischief" of racial concordance from healthcare because it sows, "reinforce[s]," and "preserve[s]" unfounded distrust between doctors and patients on racial lines. *Adarand*, 515 U.S. at 239 (Scalia, J., concurring in part and concurring in the judgment). Do No Harm is entitled to relief.

## PARTIES

12.     Plaintiff, Do No Harm, is a nationwide membership organization of healthcare professionals, students, patients, and policymakers who want to protect healthcare from radical, divisive, and discriminatory ideologies. Do No Harm's purpose is to keep these ideologies out of medical education, clinical practice, and research fields.

13.     Do No Harm accomplishes its mission through education and advocacy about the dangerous ideas being embedded in medicine and related fields. It has, among other things, sued the University of Washington School of Medicine for operating a BIPOC physicians-only directory, sued private medical and health-research organizations for creating racially exclusive fellowships, and filed administrative complaints against medical schools that create fellowships and scholarships that exclude students based on race.

14.    Do No Harm has at least one member, Member A, who is excluded from the Directory based on race. A white doctor who serves many black patients, Member A is ready and able to apply for his name to be added to the Directory, once a court orders Defendants to stop discriminating. He will do so, as soon as a court issues that order.

15.    Defendant, University of Pennsylvania Health System, is a private hospital system affiliated with the University of Pennsylvania with presence in southeast Pennsylvania, New Jersey, and Delaware. Together with the Perelman School of Medicine at the University of Pennsylvania, the Penn Health System conducts business as Penn Medicine. *See* Penn Med., *Facts & Figures 2023* at 2 (last visited Mar. 17, 2025), perma.cc/9WER-R79S. The Penn Health System—through Penn Medicine—is in partnership with the Consortium and WURD Radio to facilitate and operate the Directory, which excludes non-black doctors. The Penn Health System is headquartered in Philadelphia, Pennsylvania.

16.    Defendant, Perelman School of Medicine at the University of Pennsylvania, is a private medical school within the University of Pennsylvania. Together with the Penn Health System, the medical school conducts business as Penn Medicine. *See id.* The medical school—through Penn Medicine—is in partnership with the Consortium and WURD Radio to facilitate and operate the Directory, which excludes non-black doctors. The medical school is located in Philadelphia, Pennsylvania.

6

17.     Defendant, University of Pennsylvania, is a private university located in Philadelphia, Pennsylvania. The University operates the Penn Medical School and is closely affiliated with the Penn Health System, and its board oversees the activities of Penn Medicine. The University—through Penn Medicine—is in partnership with the Consortium and WURD Radio to facilitate and operate the Directory, which excludes non-black doctors. The University is located in Philadelphia, Pennsylvania.

18.     Defendant, Trustees of the University of Pennsylvania, govern and are responsible for the University's actions, including the medical school's. The Trustees created the Penn Medicine Board and oversee the activities of Penn Medicine through that board. *See* Penn Univ. Sec'y, *Penn Medicine Board* (last visited Mar. 17, 2025), perma.cc/63MT-YMUZ. The Trustees—through Penn Medicine—are in partnership with the Consortium and WURD Radio to facilitates and operates the Directory, which excludes non-black doctors. The Trustees are headquartered in Philadelphia, Pennsylvania.

19.     Defendant, Consortium of DEI Health Educators, is an organization whose mission is to "increase the number of historically underrepresented and socio-economically disadvantaged students, faculty, educators, and administrators who learn, practice, teach, and perform research in healthcare and biomedical science within the greater Philadelphia area." CDHE, *About Us*, LinkedIn (last visited Mar. 17, 2025), perma.cc/59RA-LCAV.

20.    The Consortium is composed of seven medical and health science schools in the Philadelphia area: the Lewis Katz School of Medicine at Temple University, Philadelphia College of Osteopathic Medicine, Salus University, Sidney Kimmel Medical College at Thomas Jefferson University, Drexel University's College of Medicine, Perelman School of Medicine at the University of Pennsylvania, and Cooper Medical School of Rowan University. *Id.* These schools accept federal financial assistance in the form of federal student aid and federal research grants.

21.    The Consortium is in partnership with Penn Medicine and WURD Radio to operate the Directory, which excludes non-black doctors. The Consortium is headquartered in Philadelphia, Pennsylvania.

22.    Defendant WURD Radio LLC operates 900AM-WURD in Philadelphia, "the only African-American owned and operated talk radio station in the Commonwealth of Pennsylvania." *See About Us*, WURD (last visited Mar. 17, 2025), perma.cc/PR25-42YS.

23.    WURD Radio is in active partnership with Penn Medicine and the Consortium to operate the Directory, which excludes non-black doctors. Penn Medicine and the Consortium have ceded controlling authority over the Directory's day-to-day operations to WURD Radio.

# JURISDICTION AND VENUE

24.     This Court has subject-matter jurisdiction under 28 U.S.C. §1331 and §1367(a).

25.     Venue is proper in the Eastern District of Pennsylvania under 28 U.S.C. §1391 because Defendants reside here and a substantial part of the events and omissions giving rise to the claim occurred here.

# FACTUAL ALLEGATIONS

## I.     Defendants operate the Black Doctors Directory, which excludes non-black doctors.

26.     Defendants are operating the Black Doctors Directory, an advertising and marketing opportunity only for black doctors that excludes non-black doctors. *See* Ex. B, WURD, *Black Doctors Directory* (last visited Mar. 17, 2025), perma.cc/4HC8-W972.

27.     The Directory lets doctors advertise themselves by posting their specialty, address, contact information, affiliated hospital, and picture. Ex. C, *Our Doctors*, Black Doctors Directory (last visited Mar. 17, 2025), perma.cc/5WWG-KQ3V.

28.     But as its name suggests, the Black Doctors Directory is for black doctors only. Defendants market and advertise the Directory across the internet as the *Black Doctors Directory*. The URL for the website is "phillyblackdoctors.com."



29.    The Directory "gathers information *on Black/African-American* doctors across multiple specialties and health systems in the region" and provides a searchable directory that patients can use to find black doctors in the region. Ex. A (emphasis added).

30.    Defendants work through "intentional" outreach that is "wide and broad" to "captur[e] the entire region in terms of black physicians." onWURD, *Black Doctors Directory*, supra at 3:40.

31.    The Directory's goal is to ensure "[e]asy access to Black healthcare providers." Ex. A.

32.    And the Directory explains that it wants to further "racial congruence" between black patients and their doctors in Philadelphia. *Id.*

33.    Defendants explain that, in their view, black patients "come" to the healthcare system "with distrust, fear, and, often, anxiety." onWURD, *Black Doctors Directory*, supra at 0:23-0:29. The Directory is meant to address the "challeng[e]" of "find[ing] black doctors." *Id.* at 1:38.

34.    Defendants further say that they created the Directory to enable black patients to find doctors who are "culturally aligned"—by which Defendants mean black doctors. *Id.* at 4:00.

35.    True to Defendants' promise, the Directory features only black doctors.

## II.    Defendants discriminate against Do No Harm's members.

36.    Do No Harm has at least one member, Member A, who is excluded from the Directory because he's white.

37.    Member A is an experienced dermatologist in southeastern Pennsylvania. His practice often involves overlap with autoimmune issues, cancer, and infectious diseases.

38.    As part of his dermatologist practice, Member A treats all patients to the best of his ability regardless of race. Member A regularly treats and sees black patients. He deeply cares for them and always strives to provide them with the best care. Member A considers it a professional obligation to connect with his patients on a deeper level and to be an empathetic provider.

39.     Member A advertises and markets his practice across various platforms, such as Google ads. Member A is also on various directories so that patients can find his information.

40.     But Member A is excluded from Defendants' Black Doctors Directory because he is white, not black.

41.     In late 2024, Member A learned of the Directory and visited the website. He saw that the title says the Directory is for black doctors that the purpose is to help black patients find black doctors and further racial congruence. He also watched the YouTube video explaining that the Directory exists to enable black patients to find black doctors.

42.     Member A also saw that doctors could "[r]equest more information on how to be listed" on the Directory. *See* Ex. D, *Contact Us*, Black Doctors Directory (last visited Mar. 17, 2025), perma.cc/C3Y3-5M84. But this page, too, reiterated that only a "Black Doctor" could be suggested as an addition. *Id.* Member A thus found it futile to apply for the Directory.

43.     Member A finds it hurtful and disappointing that Defendants consider him to be less equipped or less capable of providing empathy and depth to black patients. Member A is similarly dismayed by Defendants' unfounded suggestion that his black patients won't do as well because he is not black. And he is similarly disappointed that he is not welcome or eligible to add his name on a Directory that reaches a large swath of the Philadelphia population.

44.    Because Member A is excluded from the Directory, he is competitively disadvantaged in comparison to black doctors who are on the Directory. He cannot reach potential patients on an equal footing and in the same manner as a black doctor on the Directory. The competitive deficit is especially significant because Penn Medicine—which partners with WURD Radio and the Consortium—is a well-known and prestigious health system in the region. And it has a sprawling presence across southeastern Pennsylvania, New Jersey, and Delaware. Being on the Directory—with Penn Medicine's blessing—would help him reach many additional potential patients.

45.    Member A is ready and able to request to add his name to the Directory if a court orders Defendants to stop discriminating against non-black doctors. He was ready when he initially investigated the website, and he will apply as soon as that order issues.

46.    Member A is pseudonymous because he is a doctor in southeastern Pennsylvania with some ties to Penn Medicine; and if his participation in this litigation becomes public, he fears reprisal from other health professionals, Penn Medicine, and the public. Member A also does not want Defendants to hold his involvement in this lawsuit against him when deciding whether to allow him to be on the Directory.

# CLAIMS FOR RELIEF
## COUNT I
## Violation of Title VI of the Civil Rights Act of 1964
## (Against All Defendants)
## (42 U.S.C. §2000d et seq.)

47.     Do No Harm repeats and realleges the preceding allegations.

48.     Title VI of the Civil Rights Act of 1964 provides that no person "shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. §2000d.

49.     Private individuals can sue to enforce Title VI and obtain both injunctive relief and damages. *See Alexander v. Sandoval*, 532 U.S. 275, 279-80 (2001).

50.     The Directory is an operation of Penn Medicine. The Directory website states that the Directory "is presented by Penn Medicine." Ex. A.

51.     Penn Medicine's CEO and doctors actively participate in promoting the Directory. Penn Medicine's CEO announced that Penn Medicine is "in partnership" with WURD Radio to "launch[] the Black Doctors Directory."



Kevin Mahoney's Post



*See* Kevin Mahoney, LinkedIn (last visited Mar. 17, 2025), perma.cc/5FZ6-XQ5M.

52.    The Directory uses Penn Medicine's logo to borrow its prestige and influence with patients in the region and to let everyone know that Penn Medicine is "in

partnership with" WURD Radio and the Consortium to facilitate and operate the Directory. Ex. A; *see also* onWURD, *Black Doctors Directory*, supra.





53.    Penn Medicine's CEO and doctors appeared in a YouTube promotional video. *See* onWURD, *Black Doctors Directory*, supra.



**Black Doctors Directory**



**Black Doctors Directory**

54.    Penn Medicine also posted on its Facebook page that it launched the Directory to further its "key priority" of advancing "health equity." Penn Medicine – Abrahamson Cancer Center (Jan. 16, 2025), bit.ly/3RcF0WF.



**Penn Medicine - Abramson Cancer Center**
January 16 · 🌐

A key priority for Penn Medicine is to advance health equity, which is essential for all communities to thrive.

In partnership with **WURD Radio**, the only Black owned and operated talk radio station in Pennsylvania, the Black Doctors Directory (BDD) was launched in the fall of 2024. The directory is an impactful resource that connects patients with Black physicians in southeastern Pennsylvania, Delaware, and New Jersey.

The doctors included in BDD are dedicated to delivering high-quality care, fostering trust, and building meaningful relationships with patients. This initiative is a step toward improving access, outcomes, and community connections.



PHILLYBLACKDOCTORS.COM
**Black Doctors – Find physicians who provide high-quality, respectful, culturally competent care.**

55.    And on the Directory website, Penn Medicine collaborates with WURD Radio to feature "Health and Healing" radio segments.



56.     The Directory is also an operation of the Consortium. The Directory in multiple places states that it is "in partnership with" the Consortium. Indeed, the Directory states that one of the "features" of the Directory is to provide for "[e]asy access to Black healthcare provides from Penn Medicine, Jefferson, Temple, [and] Drexel." Ex. A. These schools are member institutions of the Consortium. CDHE, *About Us*, supra.

57.     The Directory is a federal "program" and "activity" under Title VI for multiple reasons.

58.     ***First***, the Directory is an operation of Penn Medicine, which in turn is an operation of the University of Pennsylvania. Under Title VI, the term "program or activity" means "all of the operations of" a "university … any part of which is extended Federal financial assistance." §2000d-4a(2)(A). The University is covered by Title VI. Penn, *Office of Religious and Ethnic Interests (Title VI)* (last visited Mar. 17, 2025), perma.cc/5MVJ-L59K. The University accepts federal financial assistance in the form of federal student aid, *see* Penn, *Financial Aid Funds* (last visited Mar. 17, 2025), perma.cc/MFL9-HQP5, and federal research grants, Penn, *Funding* (last visited Mar. 17, 2025), perma.cc/ZLT6-PC7P, to name a few. Because the University is covered by Title VI, all of its operations—including Penn Medicine and the Directory—constitute a federal program or activity.

59.     ***Second***, the Directory is an operation of Penn Medicine, which is principally engaged in providing education and healthcare. Title VI defines a "program or activity" as "all of the operations of" "an entire … private organization … which is principally engaged in the business of providing education [and] health care … any part of which is extended Federal financial assistance." §2000d-4a(3)(A)(ii). Penn Medicine consists of the Penn Health System and the Penn Medical School and is thus principally engaged in providing healthcare and education. The Penn Health System accepts federal financial assistance in the form of Medicare and Medicaid payments. *See* Penn Med.,

*Penn Medicine's Accepted Health Plans* (last visited Mar. 17, 2025), bit.ly/4iQsbgB. And the Penn Medical School accepts federal financial assistance in the form of federal student aid and research grants. Because Penn Medicine is principally engaged in providing healthcare and education, the Directory—an operation of Penn Medicine—is covered by Title VI.

60.    **Third**, the Directory is an operation of the Consortium. Title VI defines a federal "program or activity" to include "all of the operations of" any entity "established by two or more of the entities" described in §2000d-4a(1), (2), or (3). §2000d-4a(4). The Consortium "is comprised of seven medical and health science schools" in the southeast Pennsylvania, Jersey, and Delaware area. CDHE, *About Us*, supra. All these schools are covered by Title VI. Because these schools created the Consortium, the Consortium is covered by Title VI. *See* §2000d-4a(4). For that reason, all the Consortium's operations—including the Directory—is a federal program or activity.

61.    WURD Radio is also liable under Title VI. In *NCAA v. Smith*, the Supreme Court left open the possibility that "when a [federal funds] recipient cedes controlling authority over a federally funded program to another entity, the controlling entity is covered by" statutes like Title VI or Title IX "regardless of whether it is itself a recipient." 525 U.S. 459, 469 (1999). This position was endorsed by the United States. *Id.* (citing U.S.-*Smith*-Br. 20-27, 1998 WL 858534).

62. On remand in *Smith*, the Third Circuit observed that "controlling authority exists when a[n] … entity receiving federal dollars *has delegated control* to a private actor." *Smith*, 266 F.3d at 160.

63. Other courts have similarly held that "an entity that has 'controlling authority' over a federally funded program is subject to the antidiscrimination provisions …, even when the entity does not directly receive federal funding." *Doe One*, 2022 WL 3139516, at *12; *see also, e.g.*, *id.* at *13-14 (holding that pharmacy benefit managers "exercise controlling authority" over pharmacies' discriminatory prescription drug benefits plan and thus are covered by §1557 regardless of whether the PBMs receive federal financial assistance); *Williams v. Bd. of Regents of Univ. Sys. of Ga.*, 477 F3d 1282, 1294 (11th Cir. 2007) (applying Title IX to a private athletic association affiliated with a public university when the plaintiff alleged that the university "ceded control over … the athletic department" to the association that disputed that it was a federal-funds recipient).

64. Penn Medicine and the Consortium ceded controlling authority over the Directory to WURD Radio to operate the Directory on a day-to-day basis.

65. The Directory states that it was created "in honor of WURD founder, Walter P. Lomax Jr., M.D." Ex. A.

66. And the Directory is primarily run through WURD's website, Facebook account, Instagram page, and YouTube channel as a WURD initiative. *See* WURD (last visited Mar. 17, 2025), perma.cc/N6ZY-A6JH; WURD, Facebook (last visited Mar. 17, 2025), bit.ly/3XNfMC2; onWURD, Instagram (last visited Mar. 17, 2025),

bit.ly/3FttL9Q; onWURD, YouTube (last visited Mar. 17, 2025), bit.ly/4iHaqQI. WURD also continues to produce and post new radio segments on health and healing which are available on the Directory website.

67.    Defendants have caused and will continue to cause non-black physicians to be "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" the Directory "on the ground of race, color, or national origin." §2000d.

68.    The text of Title VI indicates that it is "*always* unlawful to discriminate among persons even in part because of race" without subjecting racial classifications to strict scrutiny. *Harvard*, 600 U.S. at 308-09 (Gorsuch, J., concurring).

69.    Even if the Directory should be analyzed under strict scrutiny, Defendants cannot satisfy it. "[A]ll racial classifications … must be analyzed by a reviewing court under strict scrutiny." *Adarand*, 515 U.S. at 227 (1995). Defendants "bear[] the burden to prove that the reasons for any racial classification are clearly identified and unquestionably legitimate." *Fischer v. UT-Austin*, 570 U.S. 297, 310 (2013) (cleaned up).

70.    There is no compelling interest that justifies categorically excluding non-black doctors from the Directory based on race or ethnicity. The Supreme Court has recognized compelling interests in the use of race in only the narrowest of circumstances where those preferences are explicitly designed to remedy recent acts of discrimination and to make the *individual subjects* of that discrimination whole. *Harvard*, 600

U.S. at 207. Defendants have no "specified, identified instances" of recent "past discrimination" that its Directory is trying to remedy. *Id.*

71.    Nor is the Directory narrowly tailored to achieve any compelling interest. A categorical exclusion of entire racial groups is, by definition, not narrowly tailored. Non-black doctors' race operates as a negative against them. The Directory's use of race also has no end point. Defendants considered no race-neutral alternatives. And more.

72.    Especially in 2025, Defendants should know that federal-funds recipients should not operate any race-based programs that violate federal anti-discrimination laws. *See, e.g.,* Exec. Order 14,173, §3(b)(iv) (Jan. 21, 2025). But Penn Medicine especially is flouting the law by not only continuing to operate the Directory with the other Defendants but also operating other racially discriminatory programs for medical students, including an immersive program for medical students who are "underrepresented in medicine" that took place just days ago (when Executive Order 14,173 was in effect), *see* All. for Minority Physicians, *Penn/CHOP Alliance of Minority Physicians: Pathways to Excellence in Medicine Initiative* (last visited Mar. 17, 2025), perma.cc/T8LS-W25H.

73.    Defendants—through the Directory—are violating Title VI.

## COUNT II
## Violation of Section 1557 of the Affordable Care Act
## (Against All Defendants)
## (42 U.S.C. §18116)

74.    Do No Harm repeats and realleges the preceding allegations.

75.     Under Section 1557 of the Affordable Care Act, "an individual shall not … be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance, including credits, subsidies, or contracts of insurance" because of race. 42 U.S.C. §18116(a).

76.     Private entities and individuals can sue to enforce Section 1557 and obtain both injunctive relief and damages. *Id.*

77.     When Congress enacted Section 1557 in 2010, the phrase "program or activity" had a "prevailing understanding." *T.S. ex rel. T.M.S. v. Heart of CarDon LLC*, 43 F.4th 737, 742 (7th Cir. 2022). Namely, the Civil Rights Restoration Act of 1987 cemented the understanding that "program or activity" includes "'all of the operations of'—among other entities—'an entire corporation, partnership, or other private organization, … which is principally engaged in the business of providing … health care … any part of which is extended Federal financial assistance.'" *Id.* And it includes the "other entities" mentioned in 42 U.S.C. §2000d-4a. *Id.* So when Section 1557 uses the same phrase "program or activity," at a minimum, it includes the entities mentioned in the Civil Rights Restoration Act. The term "health" modifies "program or activity" and describes that Section 1557's applies to "certain types of entities" as defined by HHS. *Id.* at 743; *see also Doe One*, 2022 WL 3139516, at *5.

78.     HHS regulations also broadly define health program or activity. It means "[a]ny project, enterprise, venture, or undertaking" to (i) provide or administer health-

related services, (ii) provide assistance to persons in obtaining health-related services, (iii) provide medical care, (iv) engage in health research, or (v) provide health education for healthcare professionals or others. 45 C.F.R. §92.4. It also includes "[a]*ll of the operations* of any entity principally engaged in the provision or administration of any health projects, enterprises, ventures, or undertakings" described before. *Id.* (emphasis added).

79.    The Directory is a health program or activity under Section 1557 for multiple, independent reasons. ***First***, the Directory is a "project, enterprise, venture, or undertaking" to "provide assistance to persons in obtaining health-related services." *Id.* The Directory seeks to make it easier for black patients to find black doctors. All of the Defendants are participating in this project, enterprise, venture, or undertaking together. WURD Radio is doubly responsible because it exercises controlling authority over the Directory. *See, e.g., Doe One*, 2022 WL 3139516, at *13-14.

80.    ***Second***, the Directory is an operation of the Penn Hospital System. Because the Penn Hospital System is principally engaged in providing medical care and administering health-related services, all of its operations—including the Directory—constitute health program or activity. WURD Radio is liable because it exercises controlling authority over the Directory.

81.    ***Third***, the Directory is an operation of the Penn Medical School and the Consortium of DEI Health Educators. Because these Defendants are principally engaged in providing health education and health research, all of its operations—including

26

the Directory—constitute health program or activity. WURD Radio is liable because it exercises controlling authority over the Directory.

82.    Defendants have caused and will continue to cause non-black doctors to be "excluded from participation in," "denied the benefits of," and "subjected to discrimination under" the Directory because of their race. §18116(a).

83.    Because the Directory violates Title VI, it also violates Section 1557.

## COUNT III
## Civil Conspiracy
## (Against All Defendants)
## (Pennsylvania Common Law)

84.    Do No Harm repeats and realleges the preceding allegations.

85.    Under Pennsylvania common law, a civil conspiracy can be shown if four elements are met. First, two or more persons "act[ed] with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose." *PDC Machs. Inc. v. Nel Hydrogen A/S*, 2018 WL 3008531, at *4 (E.D. Pa. June 15). Second, the defendants made "an overt act … in pursuance of the common purpose." *Id.* Third, the conspiracy resulted in "actual legal damage." *Id.* Fourth, the defendants acted with "malice"—that is, "an intent to injure" that lacks "justification." *Id.* at *4 (cleaned up) (quoting *Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 472 (Pa. 1979)).

86.    Defendants acted with a common purpose to exclude non-black doctors from the Directory. Defendants touted that they were "in partnership" with each other to operate the Directory.

87.     That exclusion of non-black doctors is unlawful because it violates Title VI and Section 1557. "An actionable civil conspiracy must be based on an existing independent wrong or tort that would constitute a valid cause of action if committed by one actor." *Reese v. Pook & Pook, LLC*, 158 F. Supp. 3d 271, 292 (E.D. Pa. 2016) (cleaned up). Wrongful conduct that would be actionable under federal law can support civil conspiracy under Pennsylvania common law. *See, e.g.*, *Watkins v. Pa. Bd. of Prob. & Parole*, 2002 WL 32182088, at *3-7, *10 (E.D. Pa. Nov. 25) (racial discrimination that violates §1981 and Title VII).

88.     Defendants committed numerous overt acts. Defendants met to discuss the Directory's concept, purpose, launch, and operations. Defendants created the Directory website, marketed the Directory on YouTube, Facebook, LinkedIn, and Instagram, solicited black doctors to be on the Directory, and continue to facilitate and direct the Directory's operation.

89.     Defendants' conspiracy resulted in actual "legal harm." *Gregory v. Chehi*, 843 F.2d 111, 118 (3d Cir. 1988). Under Pennsylvania law, "the existence of identifiable damages, even if nominal" can support civil conspiracy. *Pelagatti v. Cohen*, 536 A.2d 1337, 1346 (Pa. Super. 1987); *accord Feinberg v. Eckelmeyer*, 2009 WL 4906376, at *13 (E.D. Pa. Dec. 16). It is "the *fact* of damages, rather than the amount, that is the key inquiry." *Pelagatti*, 536 A.2d at 1346. Here, Defendants' exclusion of non-black doctors from the Directory because of race caused actual legal harm.

90.     Racial discrimination by itself inflicts a legal injury. It "demeans the dignity and worth of a person" to judge them "by ancestry instead of by his or her own merit and essential qualities." *Harvard*, 600 U.S. at 220. This "denial of equal treatment resulting from the imposition of the [racial] barrier" *is* the injury. *Ne. Fla. Chapter of the Associated Gen. Contractors of Am. v. City of Jacksonville*, 508 U.S. 656, 666 (1993); *see also Shea v. Kerry*, 796 F.3d 42, 50 (D.C. Cir. 2015) ("the injury lies in the denial of an equal *opportunity* to compete, not the denial of the job itself"). Racial discrimination is "essentially irremediable." *AAER v. Fearless Fund Mgmt., LLC*, 103 F.4th 765, 780 (11th Cir. 2024). It's so pernicious that courts "presume" that the plaintiff suffers not just any injury—but an irreparable injury—from "racial discrimination." *Gresham v. Windrush Partners*, 730 F.2d 1417, 1424 (11th Cir. 1984); *see also, e.g., Silver Sage Partners, Ltd v. City of Desert Hot Springs*, 251 F.3d 814, 827 (9th Cir. 2001); *AAER v. Founders First Cmty. Dev. Corp.*, 2024 WL 3625684, at *5 (N.D. Tex. July 31). Member A suffered racial discrimination when he was excluded from the Directory because he wasn't black. This injury is redressable by damages, including nominal damages that Do No Harm seeks here.

91.     Defendants' race-based exclusion of non-black doctors also caused the deprivation of valuable economic benefit for non-black doctors—i.e., free advertising and marketing platform for doctors to reach patients. Doctors market their services and specialties through various media. And they must pay money to market their ser-

vices. For instance, Member A has paid money to advertise his medical practice. Defendants' racial discrimination has deprived Member A of the valuable economic benefit of advertising his services on the Directory at no cost.

92.     Defendants also caused competitive injury to non-black doctors by giving "competitive advantage" to black doctors through free advertising on the Directory. *Feinberg*, 2009 WL 4906376, at *11; *see also PDC Machs.*, 2018 WL 3008531, at *5 (harming the plaintiff's "competitive advantage" supports civil conspiracy). Currently, black patients who seek to find a doctor on the Directory will *never* see a non-black doctor on the Directory because it excludes non-black doctors. Those patients are substantially likely to be diverted to the black doctors who are on the Directory. For instance, Member A regularly treats black patients. And though a trained dermatologist, Member A treats patients with dermatological conditions that implicate allergy, autoimmune diseases, infectious diseases, and cancer—the specialties specifically featured on the Directory. Ex. C. Yet black patients won't see Member A on the Directory and are likely to go with a black doctor whom they see on the Directory.

93.     Defendants acted with the intent to injure non-black doctors and without sufficient legal justification. Defendants intentionally excluded non-black doctors from the Directory because of their race. Defendants also intentionally sought to divert black patients away from non-black doctors to black doctors by operating a black-doctors-only Directory based on their pernicious race-concordance ideology.

94.    There's no legal justification for this categorical exclusion of non-black

doctors.

## PRAYER FOR RELIEF

Do No Harm asks this Court to enter judgment in its favor and against Defend-

ants and to provide the following relief:

A.    A declaratory judgment that Defendants, through the Black Doctors Directory, are violating Title VI, Section 1557, and Pennsylvania law.

B.    A permanent injunction barring Defendants from operating a directory that excludes physicians based on race.

C.    Nominal damages of $1.

D.    Reasonable costs and expenses of this action, including attorneys' fees, under 42 U.S.C. §1988 and any other applicable laws.

E.    All other relief that Do No Harm is entitled to.

Dated: March 18, 2025

/s/ Jonathan S. Goldstein
Jonathan S. Goldstein, Esq.
  (PA Bar No. 201627)
Shawn M. Rodgers
  (PA Bar No. 307598)
GOLDSTEIN LAW PARTNERS, LLC
200 School Alley, Suite 5
Green Lane, PA 18054
(610) 949-0444
jgoldstein@goldsteinlp.com
srodgers@goldsteinlp.com

Respectfully submitted,

/s/ Cameron T. Norris
Thomas R. McCarthy*
Cameron T. Norris*
Marie E. Sayer*
Zachary P. Grouev*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
tom@consovoymccarthy.com
cam@consovoymccarthy.com
mari@consovoymccarthy.com
zach@consovoymccarthy.com

*Attorneys for Do No Harm*

*pro hac vice applications forthcoming